We'll start with the first case on calendar, Levy v. Young Adult Institute. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Michael Prehm for the YAI Defendants. I've reserved two minutes for rebuttal. The parties raised seven issues on appeal. I'm intending to address only two issues today, but would be happy to answer any questions regarding the other five. Well, I thought there were six, but you already have six. The first issue that I'd like to address is whether the district court erred when it failed to consider and analyze the federal common law defense to contract enforcement. If this court were to agree with YAI, we don't believe that the court needs to address five other issues that were raised on appeal that are initially dependent upon a finding that the federal common law does not stand in the way to enforcement of the contract. There is one issue that the parties raised on appeal that is not dependent upon that initial finding, and that is regarding the 1992 insurance policies and whether those 1992 insurance policies are assets of the SERP. That's the second issue I'd like to address today. Going back to the first issue on whether the public policy defense- Aren't they in his name? The 1992 policies are, Your Honor, in his name, and I'm happy to take that issue up first. Are those policies that, life policies that can be tapped for assets as they accumulate? That is correct, Your Honor. They are investment-based policies in that regard. Those investment-based policies, were they included in the 90% figure that the compensation board thought appropriate for a charity? They were not, Your Honor. The 1992 insurance policies were purchased at- Let's see. He was running a charity, and he was going to be in the 90th percentile of compensation for people who operate or who have executive responsibility for charities or private companies of that size, but in addition, he also, the YAI also funded five insurance policies? YAI procured those policies to fund its obligations to SERP participants. It was done at a time when the SERP did not have a bank serving as a trustee. There were two individuals serving as a trustee. When a bank serves as a trustee, it usually takes the policies in its own name. What we have, though, is a 25-year history between the parties, which showed that the 1992 insurance policies were not Levy's assets, but assets of the SERP. In fact, before the district court- Assets of the SERP or not. Assume, assume that they were his assets. They were acquired because he received that as compensation, and I think the question that Judge Jacobs asked and that I would want to pursue is, it didn't seem to me that that was taken into account in assessing the reasonableness of his, what I'll call salary payments, when he's also receiving significant insurance policies. Am I right about that? You are, Your Honor. Now, did you urge the district court to take that into account in assessing whether it went beyond reasonableness because he received actually more than 90% of what the average payments were? What we did argue before- What we did argue before the district court, Your Honor, was that those 1992 insurance policies were never part of any compensation study that was done to reflect Levy's personal compensation over the years. There's no dispute over that. These were always considered only to be assets of the company. So there is not a standard by which any compensation consultant signed off on the 1992 insurance policies as being reasonable compensation for Levy. And then before the district court, Your Honor, they made three arguments conceding that the 1992 insurance policies were assets of the SERP. They counted the 1992 insurance policies as assets of the SERP to determine that the plan was fully funded at the time that he retired. They counted the 1992 insurance policies as assets of the SERP to argue that the- Was that part of the LIPT? No, these are separate from the LIPT. But the LIPT had like $3 million in life insurance also. They do. Separate policies. Well, that's a different and separate obligation to pay. Was that considered in assuring that he would get at least 90% of what executives in comparable organizations- No, Your Honor. Both the SERP and the LIPT were excluded from the compensation analysis. That was millions. $3 million. Correct, Your Honor. And life insurance. That's the LIPT. Right. SERP is not $3 million. Right. And essentially what has happened is Mr. Levy's received $5 million in retirement benefits. And he's seeking between the SERP and the LIPT an additional $14 or $20 million of benefits on top of the five that he's already received. Well, I mean, he certainly believes that charity begins at home. That may be true, Your Honor. But we do believe that the public policy defense that we've asserted under the federal common law stands in the way to the contract enforcement. And the district court did not analyze that federal law defense. We have a New York AG that presumably oversees charities in this state and decides what's reasonable and not. I mean, if they're torpid or lazy or stupid, why are we going to have a federal common law oversee this? Sure. And I think the Kaiser Steel decision by the Supreme Court addresses that very point, Your Honor. In Kaiser Steel, the issue was an NLRA violation. The NLRB has exclusive jurisdiction over violations of the NLRA. But the Supreme Court said, notwithstanding that regulatory enforcement mechanism, we're going to allow a violation of the NLRA to be a basis for public policy to bar enforcement of a contract between private parties. So under the federal common law, the existence of a regulatory enforcement mechanism does not stand in the way of the public policy defense under federal common law. And we think the district court erred in failing to take that into account. In those cases, wasn't the illegality asserted self-evident, which is the whole point here? It's not clear whether this is excessive compensation. It's not even clear whether it's excessive compensation under the Internal Revenue Code, much less under a federal common law theory. And that argument was rejected both in Kaiser Steel and by the Seventh Circuit in Costello, that the contract does not need to be intrinsically illegal on its face. It's whether the performance of the contract would violate the law. And in Kaiser Steel, the Supreme Court was clear that says, if the court were to order the defendant to undertake performance in a way that would violate the common law, the public policy flat out bars enforcement. There's no weighing of pros and cons at that point. It's only once we get past the point of whether the court's order would require the defendant to undertake unlawful conduct, then do we start balancing equities. And we think that that's the real difference between the federal law and the New York law, which the district court relied on. The district court only relied upon New York law. It said nothing about Kaiser Steel and its progeny. And there are real differences. But this- As I understand it, you want us to find federal common law to effectively be what's stated in the secondary statement of contracts? Did I understand you correctly? Your Honor, the first argument is that under Kaiser Steel, if the performance here, which the court would order, would require us to violate the code, the Internal Revenue Code, or the MPCL, that it's a flat out bar to enforcement. I show that because the Internal Revenue Service has not been willing to accept that argument. But the Internal Revenue Service, Your Honor, ruled that it could not pursue levy because of the grandfathering of the only tool that it has available to it. It did not agree that the compensation was reasonable. It sounds like you want sort of a backdoor private right of action under the Internal Revenue Code, which would be a very expansive prospect. Again, another issue that was directly addressed by the Supreme Court and Kaiser Steel. Kaiser Steel said that providing public policy as an affirmative defense is not an alternative affirmative remedy contrary to the will of Congress. We're in a curious position here. I mean, you're basically saying we entered into this contract with this gentleman, who worked for us for decades, but now we don't want to. Now, we want you to say that what we did was against public policy. What we both did, Your Honor, unknowingly did. Unknowingly? Unknowingly. What did you not know about the fact that you were paying him over $600,000 and giving him insurance contracts worth millions? We did not know, Your Honor, that the enforcement, that that payment, that level of payment would exceed the compensation limits that are set forth in the Code and the NPCL. That's only because you chose not to inquire. Your Honor, Mercer reported to us for the first time in 2011 that that was the case. And that was after the NYAG's office, excuse me, Opwin. You had not made any inquiry up until that point, which you certainly could have done. I mean, you were deciding what to pay someone, and you made no inquiry into whether these were reasonable payments. The standard, what was being done at the time, Your Honor, is that the reasonable compensation test for purposes of intermediate sanctions, these two programs were not included in that because they're grandfathered. Let me ask you, assuming we were persuaded, whether under common law, New York policy, whatever, that these were not reasonable contracts, what do you want as the end result here? Do you want to walk away from them entirely? No, Your Honor. What we'd like is the district court to make a determination of what is the reasonable amount. And we believe that on remand that the district court could accept expert evidence on what is a reasonable level of compensation to be paid, additional compensation to be paid to him. Looking backwards over decades. And you can certainly look at the compensation studies. You actually did retain people to ascertain whether this level of compensation was reasonable. Heaven knows what they were thinking, but they said it is. The historical compensation studies did not address the SERP and the LIBT. The first report that did that was the Mercer report, and upon getting that report in 2011 is when we ceased the payments. So you want us essentially to issue a holding that allows other comparable organizations to go back and take a look back at things and decide whether they've overpaid their senior executives? No, Your Honor. Those things are unreasonable. I don't understand, back to what Judge Radji was asking, how it is that you want us to do anything having not received a determination from the IRS that what he was paid, what the levies were paid, was unreasonable? Period. Your Honor, I do think Kaiser Steel addresses this, that the court can make the determination as to what is an appropriate level of compensation. Again, the IRS cannot make that determination because it cannot go against levy under its regulatory mechanism. Well, you know, Kaiser Steel only says the district court has to consider the defense. It doesn't say that this is mandatory. You're presenting a district court and this court with a very complicated situation. So we can consider it, but you can consider the fact that the IRS hasn't acted on it. New York State hasn't acted on it. We've considered it. We don't want to get into this mess that you've all created. Why isn't that an appropriate exercise of discretion? The Supreme Court in Kaiser Steel said a federal court has a duty to determine whether the contract violates federal law. And we have considered it, and right now we have the IRS, which has been asked to look at it, not taking a position that it violates federal law. Your Honor, the district court did not conduct the analysis of whether the federal common law applies. It only applied to New York law, the New York law defense, and we believe that that is error. Thank you. May it please the Court, Michael Rackauer for Plaintiffs, Appellees, and Cross Appellants, Dr. Joe Levy and Judith Lynn. I'd like to reserve three minutes for rebuttal on my cross appeal. No, just . . . Okay, Your Honor. I'll address the two points that YI's counsel raised. If Your Honor has any further questions, I'll address those, then I'll turn to the cross appeal. With respect to the 1992 policies, Your Honor, the four corners of the contract make clear that they're owned by Dr. Levy. We wholly dispute the factual . . . It was part of the compensation he received, and as far as I understand it, that was not factored into an assessment of whether his total compensation package exceeded the bounds of reasonableness. We disagree, Your Honor. First of all, as a matter of law, under section 4958, pursuant to the IRS ruling, that the life insurance policies at issue were grandfathered in because they were purchased long before 4958 was enacted, and as a matter of law, they're grandfathered in. No, but we have a decision here that because the $600,000 plus a year he was receiving his salary was at the 90th percentile of compensation, it couldn't be said that it was unreasonable as a matter of law. But that placement of him at the 90th percentile did not take into account that he was also receiving the benefit of millions of dollars in insurance policies. I don't agree . . . Shouldn't that have to have been considered? I don't agree with that factual assertion, Your Honor. The record recognizes several compensation reports and legal opinions, which reflect the fact that Dr. Levy's total compensation was reviewed, all compensation, all, all. With respect to the 1992 insurance policies in particular, YI's actuary, the person who brokered the purchase of the insurance companies, testified that those insurance policies were purchased for Dr. Levy at the time of purchase. YI and Dr. Levy and the compensation consultants and lawyers were on notice of Dr. Levy's total compensation. Your Honor . . . They were on notice of it. Did they conclude that his compensation, so augmented, would be at the 90th percentile of compensation for executives similarly situated? The answer is they . . . Yes. Yes is the answer. Including the insurance policies? When the lawyers . . . You're talking about millions of dollars here, paid by a charity. The answer is yes, that they looked at the total compensation. I want to answer Your Honor's question with particularity. The reports and the legal opinions use slightly different wording when describing the total compensation, but there's no qualification in the review. There's an analysis that the compensation consultants engaged in and that the lawyers engaged in, in terms of determining what is reasonable. And there are two different standards, perhaps, at issue. One concerns 4958, meaning the intermediate sanctions regime. And one concerns, perhaps, the overall reasonableness. The IRS, in their letter to YI, after YI campaigned for two years to try to cause them to take action, concluded that when Dr. Levy's compensation met the intermediate sanctions safe harbor, they closed the book on the question. Meaning, Your Honors are raising the question whether, notwithstanding the fact that Dr. Levy's compensation met intermediate sanctions, is it nonetheless, perhaps, unreasonable. The IRS said, we're not interested. The same goes with the New York Attorney General's Office, who reviewed Dr. Levy's compensation, who reviewed the compensation reports, who reviewed the legal opinions. And notwithstanding Your Honor's personal perception that the compensation may be rich, recognized that it was within the band of reasonable. That's what everyone recognized based upon the high level legal opinions and the compensation reports that were granted. And the district court recognized that hindsight regret is insufficient to unwind these transactions. With respect to the public policies issues at stake, Kaiser is inapplicable. First of all, YI waived the argument that the federal common law is somehow distinct from New York state law. When they argued at the lower court level, on three different occasions, essentially, that there was a unified body of case law. Your Honors are aware that there was an initial summary judgment decision, an objection to the district court after the report and recommendation by Magistrate Netburn was raised. And then subsequently, one year later, they tried to revisit the issue in a second summary judgment motion raised by the plaintiffs. In all three instances, YI neglected to raise the distinction that they raised on appeal. It was waived. They offered no justification for the newfound argument. With respect to the newfound argument, Your Honor, Judge Raggi recognized the distinction that Kaiser applies, which is that in this particular, Kaiser says the contract, if you're going to have any sort of a bright line rule, the contract has to be voidable under the statute. That was a Sherman Act violation where the contract would be void. That's not what we have here. What we have here is actually a comprehensive regulatory scheme that provides for graduated taxation in the event of a violation. Hardly the type of Malum and Say violation that the appellants wish to assert. To the contrary, it's Malum prohibitum, in which case, at most, the court needs to engage in a pro-con analysis. Of course, the second point in Kaiser also renders this issue inapplicable, in that Kaiser says the statute has to be designed to protect the individual who is asserting it. Because Kaiser doesn't want a party using the issue of illegality as a sword rather than a shield. It specifically includes language that they don't want a party to get something for nothing. That is exactly why he wants to do with the 74-year-old man that we represent on this appeal, who's entitled to his retirement benefits and to enjoy his golden years. Public policy, when weighing the pros and cons of enforcement of a unilateral contract with respect to ERISA benefits, strongly supports enforcement. It is a unilateral contract. Dr. Levy performed it for almost 40 years. He was fully vested in his benefits. It's an ERISA benefits contract, which means that if the court were going to contemplate divestment, it would have to strictly scrutinize any kind of divestment. YI is using the illegality defense as a sword, not a shield. There's a comprehensive regulatory scheme at issue here in which the IRS and the New York Attorney General's Office are vested with the right and obligation to police this conduct. In those situations, there is absolutely no basis to insinuate into the statute some kind of private right of action by YAI. Is Dr. Levy a medical doctor? No, Your Honor. What's his doctorate in? I believe it's in social services. He spent a lifetime in the industry and was third man in a company that had three employees and a budget of $250,000. And when he was finished with the company and upon retirement, it had more than 5,000 employees and an operating budget of $275 million approximately. In the industry, he is the gold standard of what a CEO can do to raise the profile, improve the benefits, and serve the public. Are we talking about the company that then had to pay 18 million because of overcharges?  I partly suggest gold standard, but that's not the point before us. But just so that you understand in your characterization, we have read the full record. I appreciate the full record, Your Honor. I'm cognizant of it. And unfortunately, Dr. Levy was in retirement when YAI capitulated. And had he been the CEO, they would not have capitulated because the overcharges, as alleged, were not nearly as significant as they actually were. That fact is borne out by the fact that Dr. Levy and all executives admitted to nothing, were fined nothing, and were given full releases. What YAI did is they made a strategic plan to settle that action and try to take it out of the hides of the senior executives improperly. And they engaged in an elegant scheme, which Your Honor's fully well aware because you've read the briefs, where they endeavored to throw the executives under the bus. They threatened all of them. Most of them capitulated because they were still employed and wanted to maintain a job. Executives on whose watch these bills were submitted. Your Honor, those bills were submitted after- We're not litigating that case. But why don't you bring it back to the contract action we have before us? Well, I think the public policy issue, as I raised it, resolves the question wholly. There is no bright line rule that applies here, why I waive the argument anyway. And on a pro-con analysis, it's overwhelmingly in favor of enforcement of a unilateral contract, particularly when ERISA benefits are involved. The 1992 policies, just to underscore it again, are on their face in Dr. Levy's name. The compensation consultants and the lawyers reviewed the total compensation. The IRS and the Attorney General's Office are standing by, ready to regulate this issue if they feel that they should. They have never done so. And YI has no independent right to challenge the compensation at this juncture. If your honors have no further questions with respect to the appellant's issues, I'd like to turn- Move on to your cross-appeal. Okay, just a couple of issues, your honor, with respect to the misappropriation of $15 million worth of SERP funds and YI's failure to purchase the commercial annuity. Both of those items are actually critical to the relief that Dr. Levy sought. Is there any sign that the charity is insolvent? There is no sign that the charity is insolvent right now, your honor. That's money from the state. I mean, the state may be insolvent, but it still pays. I think that point of view disregards the terms of the contract entirely, your honor, and it would be prejudicial to the counterparty of the contract, in this case the SERP beneficiaries, at this point. Is the relief you're seeking relief in equity? It depends which item we're talking about. Which item is in equity? The accounting claim is an equitable claim, 502A3. The accounting claim, which would require the return of the SERP assets, after having been misappropriated, the $15 million, that's a 502A3 claim, that's in equity. The 502A1B claims, which are for the purchase of the commercial annuity, and also for enforcement of the SERP, which would require the return of the funds as well, that's at law. So the contract is quite clear. YI took money from the SERP, $15 million, that it was not allowed to take. Now, your honor, they weren't allowed, period. End of story. The SERP is ironclad about the security that it provides for participants and beneficiary. Once the money's put in there, YI did not have an obligation to fund the SERP. But once it went in there, it had an obligation not to touch it. And once we proved that they . . . They didn't. Can I assume that the charity itself would have suffered sanctions at the hands of the attorney general? No. I don't believe you can assume that at all. So they didn't have to pay it? Or is this to the federal government? What would have happened if they didn't pay it? Your honor . . . Because they have fiduciary duty to protect the institution as well. Your honor, Jim Moran, who is a former Opwood official, testified at trial. He testified that Opwood issued an early alert and put YI on notice that they were concerned about YI's ability to perform their services while this settlement decree was in place. YI had five years to pay off the $18 million settlement sum. They had no obligation to accelerate . . . They had five years, period. Why . . . The concerns about early alert were that YI might not be able to perform. And Mr. Moran testified . . . Wouldn't early alert affect contributions? I don't believe that there was any testimony in the record on that subject. Let's be practical about this. I mean, if a charity is under surveillance because of misconduct, isn't that likely to interfere with the flow of voluntary contributions? When coupled . . . I understand that that would be a factor. The flip side to that factor is that they remained a best-in-class service provider based upon the leadership at YI. I don't think that the law recognized in any way that factor as part of the analysis. The plain fact is that YI was not on the brink of insolvency. There was no analysis done that should their contributions be reduced to X, they would be insolvent. What they did is they took a lump sum and transferred it over precisely because what they wanted to do is furtively and illegally impose the obligation of the settlement upon the executives. That's self-help, extrajudicial, and illegal, Your Honor. Thank you. We'll hear from . . . Thank you. Going back to the public policy defense, it's important to recognize that the plaintiffs never put forth any arguments before the district court regarding the federal common law defense. The district court never addressed . . . You said that before the district court, you did not distinguish between New York policy and federal common law. Do you want to respond to that? I do, Your Honor. We clearly said that under both federal law and New York law . . . Right, but the point is you didn't say how they were distinguishable, and yet you're before us saying that the district court erred in considering New York law at all. But my point is I'm not sure where counsel is wrong in saying that in the district court, you didn't distinguish between the two. Your Honor, they came back with a set of arguments regarding New York law.  The standard for federal common law was different from the standard of New York law. Your Honor, the issue never came up in the district court because the plaintiffs never addressed the federal law. It would be . . . You were invoking public policy. Right. And did you tell the court, look, under federal common law, this is the standard. Under New York law, this is the standard. We urge you to apply federal common law. No, Your Honor, what we said is we apply the federal . . . Why isn't the argument that the district court erred in applying New York law and thinking that was the same as any federal common law, why is that not waived? Your Honor, this is an ERISA plan which is governed by federal law. We first and foremost said the federal law defense applies. Then the plaintiffs came back and they only focused on the New York law. A top hat plan is not governed by ERISA. It is, Your Honor. It's exempt from ERISA's fiduciary standards, but it is otherwise governed by ERISA and the federal common law. That is the Second Circuit's decision in Galeone. I'm looking at the fact that before the district court, you argued that New York and federal law overlapped to form a unified body of defense. We did not, Your Honor. Where did you argue that they were not the same? I mean, I've asked now three times and I have not heard that you did, so I'm going to assume that you did not. The distinction was not made in that regard. What we argued was that there were two bases upon which to deny the contract enforcement, federal and New York. The plaintiffs only addressed New York, and then the court only addressed New York, and we think we have preserved the issue for appeal. If it needs to get decided, then the court should vacate the ruling and remand it to the district court for consideration of the federal common law defense. And we do believe, even if you're applying a pros and cons analysis, the focus here is on the strength of the public policy. And that public policy is clearly set forth in the code and the NPCL provisions. The charity makes filings every year, correct? We do make filings with- Disclosures. Yes. And it lists the trustees and it lists the members of the executive compensation committee, correct? I don't believe, I don't know which filings would reference which are members of the compensation committee. You don't make any filings that list the trustees of a quarter of a billion dollar a year charity? We do, yes, your honor. We do set forth who are the trustees of the organization are. To identify them with their affiliation. Yes. And the same with the executive compensation committee? Who are a subset of that board, but they're not specifically identified as such. Not even with an asterisk? No. I want you to file with the court within one week just the pages of those disclosures containing the names of the trustees and affiliations beginning at the beginning of 92 and ending in 05. Beginning of 92, end of 05. And these are the 990 reports that are filed by charities, is that what your honor's- Whatever reports contain that information. We will. That's those pages and you can do it in a week, it shouldn't be difficult to accumulate it. Okay, thank you both. Thank you. We will reserve decision.